**In re George A. WOJTALA, Debtor.**

**Charles J. TAUNT, Trustee Plaintiff,**

v.

**George A. WOJTALA, Defendant.**

**Bankruptcy No. 89–03374–G.
Adv. No. 89–0539.**

United States Bankruptcy Court,
E.D. Michigan, S.D.

April 4, 1990.

Peter A. Dodge, Detroit, Mich., for defendant.

Charles J. Taunt & Assoc., William J. Vailliencourt, Birmingham, Mich., for trustee.

## MEMORANDUM, FINDINGS OF FACT AND CONCLUSIONS OF LAW

RAY REYNOLDS GRAVES, Chief Judge.

This is a case brought by the Trustee to prevent, under 11 U.S.C. 727(a), the discharge of the Debtor. The Trustee alleges that a series of conveyances by the Debtor were the product of the Debtor's intent to hinder, delay, or defraud creditors. The Defendant counters by arguing that the transfer(s) were made for fair consideration, without intent to hinder, delay or defraud creditors. Moreover, Defendant argues that the transaction was designed solely by his attorney and that because he acted only as his attorney advised, he is somehow immune from an attack under § 727(a)(2).

## I. FINDING OF FACTS

The Debtor, George Wojtala, was the owner of Waterfront Industrial Complex, Inc. ("WIC") a company that filed a chapter 11 petition in April 1987, which was converted to a chapter 7 in February of 1989. George Wojtala personally guaranteed a six hundred thousand dollar ($600,-000.) loan extended by Guaranty Federal Savings ("GFS") for the purchase of WIC. GFS sued George Wojtala on this debt and

received a judgment against him for the sum of approximately $646,000. GFS made efforts to collect on its judgment against George Wojtala, which were intensified in March of 1989 by the hiring of a new and more aggressive law firm. Subsequently, on April 24, 1989, GFS caused a writ of garnishment to be personally served on George Wojtala, which directed the turnover of certain stock interests. GFS also caused a writ of execution to be served on Peter Wojtala, George Wojtala's brother.

Prior to filing his chapter 7 petition on May 3, 1989, George Wojtala was the holder of certain interests in real property located at the Eureka Iron and Steel Works Subdivision and the Whitecomb Boulevard Subdivision. He was not, however, the sole owner of any of this property. He owned certain properties as either a joint tenant or a tenant in common with either Sophie Wojtala, his wife, or Albert and Peter Wojtala, his brothers. George Wojtala also held some real property as trustee of his mother's revocable trust.

On April 28, 1989 (four days after George Wojtala was served with the writ of garnishment and five days before he filed his chapter 7 petition) George Wojtala transferred all of his interest in the real properties mentioned above to his brothers by quitclaim deeds. Where it was necessary for George to obtain the consent and signature of Sophie in order to transfer these interests, Sophie provided it.

In return for George's interests Albert and Peter Wojtala paid George $30,000. and entered a land contract with him for the sum of $30,000. At the closing Albert and Peter Wojtala were represented by Mr. Matakis who advised them that they were in fact probably paying more for the property than it was actually worth. Mr. Matakis repeated this opinion at trial. Mr. Matakis also testified that he was contacted for the first time by the Wojtala brothers' sister shortly before the transaction. He indicated that he learned from his discussion with her that George Wojtala was preparing to file bankruptcy and that consequently the transaction in question needed to be completed on an expedited basis.

It was for this reason, Matakis explained, that he was unable to have the property independently appraised or perform a title search.

At the same closing, George Wojtala transferred away all of the cash proceeds of the sale. George transferred $20,000. to his wife Sophie, in exchange for relinquishing her dower interests. Sophie deposited the $20,000.00 in escrow, where it still remains, as a precautionary measure. George transferred $10,000. to his pre-bankruptcy counsel, in exchange for past and future services. This attorney placed these funds in escrow as well, where some portion of them still remains.

According to Debtor's pre-bankruptcy counsel, George Wojtala sought her advice on how he could keep all of the real property that he owned in his family. George Wojtala also testified that his sole motivation for engaging in this transaction was to keep his property interests in the family; the inference being that he had no intent to defraud, hinder or delay his creditors. George Wojtala testified that all of his actions were performed at the direction of his attorney.

Debtor's pre-bankruptcy counsel testified that she believed that George Wojtala's desire to keep his interests in the family could be satisfied within the bounds of proper pre-bankruptcy planning. She believed that George Wojtala, by selling his interests for what they were worth or more, would avoid hindering creditors while realizing his desire to keep the property in the family. She testified at trial that the entire transaction was structured in a manner to avoid the appearance of concealment and so that the proceeds could be reached upon a subsequent successful preference action against herself or Mrs. Wojtala.

## II. APPLICABLE LAW

The Trustee brings this action to deny discharge under 11 U.S.C. 727(a)(2)(A), which states in pertinent part that:

The court shall grant the debtor a discharge, unless—

.    .    .    .    .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate ... has transferred, ... or permitted to be transferred ...
    (A) property of the debtor, within one year before the date of the filing of the petition[.]

A plain reading of the statute indicates that if the debtor within one year of filing its petition, transfers property with the intent of frustrating creditors by keeping the property out of its reach, then the debtor is not entitled to a discharge.

▇ It is clear to this court that 727(a)(2) does not deny a discharge every time that the debtor's acts result in a delay or hinderance to a creditor. If this were otherwise, the mere act of filing in bankruptcy, because its effect is to delay and usually hinder creditors, would deny the debtor his discharge.

The drafters of § 727(a)(2) must have intended that the debtor's discharge would be denied in situations where there was more present than just the effect of delay or hinderance. Perhaps the clearest example supporting this assertion is seen in the pre-petition nonexempt-to-exempt cases. In these cases the debtor engages in pre-bankruptcy planning by converting assets which are not exempt in bankruptcy to assets which will be exempt in bankruptcy. No one would deny that such a transformation of property has the effect of delaying and hindering creditors. Moreover, it is probably only in the rarest of cases that the debtor does not *intend* (at least in part) such actions to prevent his creditors from realizing their claims out of such non-exempt assets.

Yet a number of courts have and continue to hold that such pre-petition behavior is acceptable and non-violative of § 727(a)(2). *See Matter of Smiley,* 864 F.2d 562 (7th Cir.1989). In *Smiley,* the 7th Circuit cites the three different views on transforming non-exempt property to exempt property.

Some courts have denied discharge upon a finding that at least part of the debt-or's motivation for obtaining exempt property was to keep assets away from creditors.

.    .    .    .    .

A second group of courts has relied on the policy behind bankruptcy exemption of protecting debtors from destitution in resolving that the bankruptcy courts should set a limit on the amount of assets which debtors may shield prior to bankruptcy.

A third group of courts disregards both the actual amount claimed as exempt and any evidence that the debtor is motivated by a desire to shield assets. Those courts deny discharge only where the debtor has committed some act extrinsic to the conversion which hinders, delays or defrauds.

*Smiley,* 864 F.2d 562, at 566–67 (citations omitted). The Court then continues by adopting the third position, claiming that both the amounts shielded from creditors and the debtor's knowledge of exemption law are irrelevant for purposes of 727(a)(2). Thus according to *Smiley* the trustee must prove "extrinsic signs of fraud" in order to make a 727(a)(2) case against the debtor. It appears that at least the courts in groups one and three are following the mandate of § 727(a)(2); the only difference being a matter of degree. To the extent that courts deny a discharge upon a showing that debtor transformed assets in order to shelter them from creditors (as opposed to obtaining exempt assets for solely for the purpose of having them), group one follows the precise language of § 727(a)(2). By contrast courts in group two are apparently having a difficult time denying the debtor a discharge for acting in a way that the law (absent knowledge on exemptions) otherwise permits. They do not want to reward debtors for their ignorance. What is important, however, is that in both groups the courts focus, for purposes of 727(a)(2), not on the result of the debtor's actions but on his intent while doing them. Thus it is irrelevant under both groups whether the *effect* of debtor's actions oblit-

erates a creditor's position or alternatively maintains or enhances a creditor's position.

■ This court believes that the reasons that justify ignoring the effects of debtor's actions in nonexempt-to-exempt cases, justify ignoring the effects of debtor's actions in other § 727(a)(2) cases as well. First, the statute focuses on debtor's intent at the time of the transfer, and not at the results of the transfer to see if the creditor has been delayed, hindered or defrauded. Second, where Congress wants courts to apply an effects test it says so. For example, under § 547(b) a transfer is voidable as a preference if, as a result of the transfer, the creditor receives more than he would upon liquidation. The rule is not that a transfer is voidable as a preference if the debtor intends to prefer a creditor. Hence it is clear that the Trustee can make his case under § 727(a)(2), regardless of whether a creditor is actually delayed, hindered or defrauded. All that the Trustee must prove is that the debtor intended to hinder, delay or defraud creditors when it transferred property within a year of filing.

■ Proving intent to defraud is a sufficient but not a necessary requirement in proving § 727(a)(2). Because it will be a rare occasion when a debtor stands up and admits that he intended to defraud his creditors, courts have developed indicia called badges of fraud. The factors considered by courts as indicators of fraudulent intent include, but are not limited to whether:

(1) the transfer was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer was disclosed or concealed;

(4) before the transfer was made, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*See In re Peters,* 106 B.R. 1 (Bankr.D. Mass.1989); *Matter of Brooks,* 58 B.R. 462 (Bankr.W.D.Pa.1986). *See also In re Steele,* 79 B.R. 503, 504 (Bankr.M.D.Fla. 1987), *citing Cleveland Trust Co. v. Foster,* 93 So.2d 112 (Fla.1957).[1]

■ In addition to proving intent to defraud, however, § 727(a)(2) is met by merely showing that the debtor intended, by transferring property, to hinder or delay a particular creditor. *See In re Oberst,* 91 B.R. 97, 101 (Bankr.C.D.Cal.1988).[2] Again, the debtor is not going to raise his hand and admit to transferring his assets prior to filing in order to hinder or delay his creditors. In the case at bar, and similar transactions, this court will look to a number of factors, including badges of fraud, in order to determine if the debtor's transfer was intended to hinder or delay creditors including: (1) whether the transaction is conducted at arms-length; (2) whether the debtor is aware of the existence of a

---

1. The *Steele* Court states that "If the legal *effect* of the conveyance is to delay or hinder creditors, it is fraud in the law regardless of the actual motives of the debtor or transferee." *Steele,* at 504. This interpretation, however, ignores the plain meaning of the statute which requires finding that the debtor incurred the obligation with actual intent to hinder, delay or defraud. Where five of the badges of fraud

were present, the *Steele* Court found that the transfer was made with the purpose of delaying, hindering or defrauding creditors.

2. Because we are not faced with a nonexempt-to-exempt case, we need not decide whether the mere act of taking advantage of exemption laws prior to bankruptcy is an act done with intent to delay or hinder creditors.

significant judgment or over-due debt; (3) whether a creditor is in hot pursuit of its judgment/claim and whether debtor knows this; and (4) the timing of the transfer relative to the filing of the petition. Thus while a court may, after viewing all of the relevant factors, determine that the debtor did not intend to defraud any creditor it may still reach the conclusion that the debtor did intend to hinder or delay a creditor.

■ Where the same debtor knows creditors are attempting to enforce their rights to payment, and instead transfers property that is extremely valuable to him and then places the proceeds of the sale out of the reach of all creditors a week before filing, there is a strong presumption that the debtor is attempting to frustrate the collection efforts of his creditors. The difference is whether the debtor actions are performed as he is running from creditors as opposed to running into bankruptcy. Consequently, this court will find evidence that the debtor has transferred property that he otherwise, absent aggressive creditors and bankruptcy, would not have, to be highly indicative of the debtor's intent to hinder or delay creditors.

## III. DISCUSSION

■ The Trustee has alleged that George Wojtala within one year of filing his petition participated in a transaction, the purpose of which, was to hinder, delay or defraud creditors. As a result, the Trustee argues that under 11 U.S.C. 727(a)(2) George Wojtala should be denied a discharge. This court believes that the Trustee has satisfied its burden in proving that George Wojtala engaged in a transaction with the intent to hinder, delay or defraud his creditors and holds that under 727(a)(2) George Wojtala will be denied a discharge.

George Wojtala was aware of the judgment taken against him by GFS, in excess of $600,000. He was also aware that GFS was taking aggressive measures to collect on this judgment. For example, GFS caused a writ of garnishment to be served on George Wojtala and a writ of execution on Peter Wojtala. We also find that George Wojtala, despite any testimony to the contrary, had been contemplating personal bankruptcy for some time prior to actually filing. Given these immediate circumstances, it appears that George Wojtala was running from GFS. George Wojtala knew that when he went into bankruptcy, his interests in unencumbered non-exempt real property would be sold off to the highest bidder. By the same token, he knew that if he stayed out of bankruptcy GFS was free to enforce its state court judgment. Regardless of either alternative, George Wojtala knew that he did not want GFS or any creditor to acquire his interests in the real properties in question. George Wojtala knew that he wanted to keep his properties in the family. Perhaps most important is that absent GFS's claim and the prospect of bankruptcy, this court believes that George Wojtala would not have transferred his interests.

Knowing that GFS was aggressively pursuing him and that he was soon going to file his petition, George Wojtala knew that he had to get rid of his property interests as quick as possible. Within four days of being served the writ of garnishment George Wojtala had consumated the sale of his real property interests, and in addition distributed all of the cash proceeds of the sale to his wife and attorney.[3] Clearly, this is not the type of transaction that an individual would engage in absent the pressure of creditors and the contemplation of bankruptcy.

That George Wojtala intended to hinder or delay his creditors is supported by the fact that the entire transaction was far from an arms-length deal. The buyers, despite hiring "independent counsel," performed neither an appraisal nor a title search. Mr. Matakis, the buyer's counsel, testified that while he was familiar with the area where the property was located,

---

**3.** The Trustee aptly described the closing when he said that "Albert and Peter Wojtala obtained all of the debtor's interest in all real property connected to the scrap yard. George Wojtala left the closing with none of the money and only a promise from his brothers to pay on a five year land contract." Trustee's Post–Petition Brief, at 4.

he had not even seen the properties. Furthermore, testimony suggested that the buyers may have paid too much for these property interests.[4] All of these facts support the conclusion that George Wojtala wanted to dispose of the property and that he wanted to do it quickly.[5] The final nail exemplifying the expediency with which this transaction had to take place, was that George Wojtala filed his petition five days after the closing.

This court is convinced that George Wojtala knew that GFS was closing in on him and that he transferred his real property interests as quickly as he could, so that neither GFS nor any other creditor could reach them. To reiterate, George Wojtala testified that he transferred the property in order to keep it in the family. Given his purpose, the circumstances, and the speed at which the transaction took place, this court finds that George Wojtala intended to hinder and delay any attempts by GFS to satisfy its judgment out of the property that was transferred.

■ The argument that George Wojtala received fair consideration or more than fair consideration is without merit. As I have already indicated § 727(a)(2) does not employ a net result test. The question is not whether the creditors are in fact delayed or hindered (they always are) but rather whether the debtor intended to delay or hinder the creditor. This court finds that George Wojtala intended to delay and hinder GFS and therefore I need not, and do not, go on to find that he intended to defraud GFS.

Equally without merit is the Defendant's "pure heart and empty head" defense. In its post-trial brief, Defendant argues that a debtor who reasonably relies on its attorney and who lacks the required intent, should not be denied a discharge. Given

George Wojtala's demeanor while testifying, this court does not believe that he totally relied, without thought, on what his attorney said. This court is unwilling to accept the suggestion that a debtor attempting to make a conveyance under the circumstances of the present case would not realize what is going on. The suspicions of any salesperson would be aroused when a buyer is willing to purchase goods in an expedited manner, without investigating whether the seller has set an accurate price or whether the seller even owns the goods. Moreover, even if it was reasonable for George Wojtala to rely on pre-bankruptcy counsel, this court finds that by seeking to keep the property in the family under such adverse conditions, that George Wojtala had the requisite intent to deny him a discharge.

Finally, this court is unpersuaded by the suggestion that because the entire transaction took place "out in the open" that this somehow insulates it from a § 727(a)(2) attack. While such openess may be relevant in another action under the Code, it is not an element that is in § 727, nor is it, in this court's opinion, a factor to be considered after there has been a finding that the debtor possessed the requisite intent.

## IV. FINDINGS AND CONCLUSIONS

(1) The Debtor, George Wojtala transferred his interests in certain real property within one year of filing his petition in bankruptcy.

(2) George Wojtala knew that GFS was aggressively pursuing its judgment against him.

(3) George Wojtala was planning to file his personal petition in bankruptcy well in advance of the time that he actually filed.

(4) George Wojtala thought about the possibility of GFS or other creditors realiz-

---

**4.** I do not, however, find that Peter and Albert Wojtala paid too much or too little for the property that they purchased. There were no witnesses at trial that were able to say that they had appraised the property and that it was worth a certain value.

**5.** Further support is drawn from the fact that George Wojtala turned around after selling the

property and distributed all of the cash proceeds to his attorney and his wife. This court cannot think of a more effective way of keeping assets away from creditors, and finds it difficult to believe that George Wojtala accidently or coincidently walked out of a closing without any of the proceeds.

ing their claims out of the real property that he owned.

(5) George Wojtala transferred the property in question with the intent of keeping it from his creditors, thus hindering and delaying his creditors, in violation of 11 U.S.C. 727(a)(2).

(6) This court does not make a finding as to:

(a) whether George Wojtala intended to defraud GFS or any other creditors;

(b) whether George Wojtala concealed the existence of any life insurance policies;

(c) whether George Wojtala violated 11 U.S.C. 727(a)(4)(A);

(d) whether George Wojtala violated 11 U.S.C. 727(a)(6)(C).

(7) In accordance with 11 U.S.C. 727(a)(2), the Debtor, George Wojtala, is denied a discharge.

IT IS SO ORDERED