**In re Margaretta E. BERNIER, Debtor.**

**John Adamson, Plaintiff,**

v.

**Margaretta E. Bernier, Defendant.**

**Bankruptcy No. 99–3457 (PJW). Adversary No. 99–787.**

United States Bankruptcy Court, D. Delaware.

Aug. 20, 2002.

James R. Leonard, Potter, Carmine & Leonard, P.A., Wilmington, DE, for plaintiff.

Cynthia L. Carroll, Cynthia L. Carroll, P.A., Newark, DE, for defendant.

## MEMORANDUM OPINION

PETER J. WALSH, Chief Judge.

Before the Court is the complaint of the plaintiff, John Adamson (the "Plaintiff" or "Adamson") objecting to the discharge of the debtor, Margaretta Bernier ("Debtor" or "Bernier").[1] (Doc. 1.) Plaintiff contends that Debtor's discharge should be denied pursuant to 11 U.S.C. § 727(a)(2)(A)[2] because within one year of bankruptcy, Debtor transferred property of the Debtor with the intent to hinder, delay or defraud her creditors. A hearing was held on February 28, 2001 and the parties subsequently submitted post-trial briefs to the Court.[3] After reviewing the parties' arguments, the testimony and evidence presented at the hearing, and the requirements of § 727(a)(2)(A), it is clear that Plaintiff has not carried his burden of proof in this case. Therefore, Plaintiff's objection to Debtor's discharge under § 727(a)(2)(A) must be dismissed. The following is the Court's findings of fact and conclusions of law pursuant to Fed.R.Bankr.P. 7052.

## BACKGROUND

Based upon the testimony of the witnesses, the following are the relevant facts. Plaintiff received a state court judgment in the amount of $40,473.48 (the "1994 Judgment") against Debtor in September 1994.[4]

---

1. Plaintiff cited no Bankruptcy Code provisions in his complaint (Doc. 1). It was determined at the hearing that the only cause of action that Plaintiff had adequately plead was one under 11 U.S.C. § 727(a)(2)(A). Therefore, the only issue before this Court is an objection to discharge under 11 U.S.C. § 727(a)(2)(A). (*See* Tr. 2/28/01 The Court at 12–13.)

2. Hereinafter, unless otherwise indicated, all references to "§ ___" are to a section of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

3. The post-trial briefs were: Plaintiff's Opening Brief (Doc. 16), Defendant's Brief in Response to Plaintiff's Opening Brief (Doc. 17), and Plaintiff's Reply Brief to Defendant's Answering Brief (Doc. 18).

4. Plaintiff offered no copy of the 1994 Judgment at trial and the subsequent garnishment does not state the amount of the 1994 Judgment. However, Debtor has not objected to Plaintiff's assertion of the amount of the 1994 Judgment and cites $40,473.30 as the amount of that judgment in her reply brief. (Doc. 17 at 7.) Therefore, I will accept this as the amount of the 1994 Judgment for this proceeding.

(Doc. 17 at 7, Doc. 16 at 3.) Plaintiff attempted collection of the 1994 Judgment on January 26, 1999, more than four years after the judgment was awarded, by serving a writ of attachment on Ronald D. Savage, Inc.[5] ("Savage Inc.") as garnishee for "all money, goods, credit and effects, stocks, bonds, personal property, belonging to or payable to Margaretta Bernier, defendant named herein." (Pl.Ex.4.)

Plaintiff entered no evidence that Ronald Savage, Inc. owed anything to Debtor individually. There was, however, a note (the "Note") between Lemlee, Inc. ("Lemlee"), a Delaware corporation and Ronald D. Savage, individually. (Pl.Ex.1); (Tr. 2/28/01 Bernier at 21–22; Savage at 47–48). Debtor was the shareholder and sole officer of Lemlee. (Tr. 2/28/01 Bernier at 21.) The Note resulted from Lemlee's sale of Peg's Place (renamed Ron's Place) to Savage in 1996. (Tr. 2/28/01 Bernier at 21–22, Savage at 47–48.) Savage, in a personal capacity, executed the Note with Lemlee on March 16, 1996 in the amount of $85,388.30 pursuant to that sale. (Pl. Ex.1); (Tr. 2/28/01 Savage at 47–48). The Note allowed for prepayment of the balance without penalty. (Pl.Ex.1); (Tr. 2/28/01 Bernier at 41–42). Savage made payments under the Note to Lemlee. (Tr. 2/28/01 Bernier at 22–23.) The Note was still outstanding at the time that the garnishment was served on Savage, Inc. in January 1999. (Tr. 2/28/01 Bernier at 25–26); (Pl.Exs. 1 & 4).

The Note was the sole remaining asset of Lemlee in the year prior to the Debtor's bankruptcy. (Tr. 2/28/01 Bernier at 39–40.) Lemlee had owned two bars, Peg's Place and Irish Junction, and had sold both pursuant to notes from the new owners. (Tr. 2/28/01 Bernier at 21, 23, 35–36, 39.) The second bar, Irish Junction, was sold in 1997 pursuant to an unsecured note. (Tr. 2/28/01 Bernier at 39); (Pl. Ex.1). The buyer, Paul W. Harris, filed for Chapter 7 on November 11, 1997 and was discharged of his debt to Lemlee in the amount of $128,000.00 on March 11, 1998. (Tr. 2/28/01 Bernier at 39–40.)[6]

In April 1999, facing poor health and a dire financial situation, Debtor proposed that Savage buyout or pre-pay the remainder of the Note. (Tr. 2/28/01 Bernier at 25); (Pl.Ex.2). This proposal came over four years after the 1994 Judgment was awarded and three months after the garnishment was served. This is memorialized in a written offer dated April 24, 1999 ("Buy-out Agreement"). (Pl.Ex.2); (Tr. 2/28/01 Bernier at 25–26). The income from Lemlee in the form of Note payments was Debtor's only source of income after the 1997 discharge of Harris' note. (Tr. 2/28/01 Bernier at 39.) Debtor is disabled and unemployed. (Tr. 2/28/01 Bernier at 20.) At the time she proposed the buyout, Debtor needed immediate access to the future payment stream of Lemlee distributions because her residential mortgages were in arrears, foreclosure on her residence had been threatened, she was ill,

---

5. This Court expressly makes no finding as to the effectiveness of service for the garnishment as it is not essential to the holding in this case. Effectiveness of service is an issue for the state court to decide should Plaintiff pursue an action at state law against the purported garnishee.

6. Plaintiff had no objection to Debtor's request that the Court take judicial notice of the bankruptcy of Paul Harris and the discharge of the note he owed to Lemlee, Inc. (Tr. 2/28/01 at 44–45.) The Court has examined the record of the bankruptcy filed by Paul Wallace Harris, Case No. 97–02429–HBS. Lemlee, Inc. is listed as a creditor holding an unsecured nonpriority claim, specifically a promissory note for a business, as Item 24 on Schedule F of Harris' bankruptcy petition. That promissory note was listed as an obligation in the amount of $128,000.00.

and she had no reliable transportation. (Tr. 2/28/01 Bernier at 43.) She was also influenced by the knowledge that it was difficult for Savage to come up with $12,000.00 every six months, the discharge of Lemlee's other note in Harris' bankruptcy and the fact that Lemlee's distribution of the Note proceeds was her only source of income. (Tr. 2/28/01 Bernier at 40, 43–44.)

The Buy-out Agreement allowed Savage to pay off the Note for $35,000.00 and estimated the total remaining payments due at $54,000.00. (Pl.Ex.2.) Savage provided the $54,000.00 figure. (Tr. 2/28/01 Savage at 49, Bernier at 41–42.) The outstanding principal value of the Note as of May 1999 was $39,272.54. (Def.Ex.1); (Tr. 2/28/01 Bernier at 32). Plaintiff presented no evidence to refute that $39,272.32 was the principal balance due as of May 1999.[7]

Two checks were issued by Savage, Inc. to complete the pre-payment of the Note, one for $5,000 on May 18, 1999 and one for $30,000 on May 28, 1999 (Pl.Ex.3); (Tr. 2/28/01 Bernier at 26, Savage at 49). The $30,000.00 check was made to Lemlee Inc. (Tr. 2/28/01 Bernier 28–29, Savage at 49–50.) The receipt evidencing the payments was signed by Savage as President of Savage, Inc. and by Debtor as President of Lemlee. (Pl.Ex.3.) Savage testified that he believed that he made both checks payable to Lemlee. (Tr. 2/28/01 Savage at 49–50.) However, Debtor admitted that the $5,000.00 check may have been made to her individually. (Tr. 2/28/01 Bernier at 27–29.) Since the Lemlee account was closed and the bank would not reopen the account, Debtor endorsed the checks "Lemlee" and deposited them in her personal account. (Tr. 2/28/01 Bernier 29–30.) Plaintiff offered no bank records, cancelled checks, or account statements to support his assertions that the these checks, as well as the other payments under the Note, had been made to Debtor personally.

Testimony indicates that at of the time of the buyout, Lemlee was a company in good standing. Although the Lemlee bank account was closed for lack of funds by the bank in 1997 or 1998 (Tr. 2/28/01 Bernier at 22–23), Debtor testified that she had paid the corporate franchise fees for Lemlee through 1999 (Tr. 2/28/01 Bernier at 24). Plaintiff offered no evidence that Lemlee had lost its good standing in Delaware or that its corporate life had been terminated by any means provided for by statute, its corporate charter, or any court ruling prior to April 1999. Nor was evidence offered in the form of bank records to establish that Debtor rather than the bank closed the Lemlee accounts or that Debtor was receiving the Note payments in her own name.

No evidence has demonstrated that Debtor had knowledge of either the 1994 Judgment or the garnishment at the time of the buyout or when she expended the proceeds of the buyout. While Debtor was aware of Plaintiff's lawsuit, she appears to have been unaware that Plaintiff's claim was reduced to judgment until she was subpoenaed in this adversary proceeding. (Tr. 2/28/01 Bernier at 20 & 43–44.) No evidence was presented that Plaintiff ever attempted to collect his judgment directly from Debtor or that Plaintiff ever served Debtor with notice of the 1994 Judgment. Debtor was also unaware of the garnishment. (Tr. 2/28/01 Bernier at 44.) Plain-

---

7. It is certain that the value of the Note is not the $54,000.00 sum of future payments as asserted by Plaintiff. It is a basic principle of finance that a dollar payable at a future date not worth a dollar today. *See Matter of Penn* *Cent. Transp. Co.*, 596 F.2d 1102, 1116 (3d Cir.1979) ("Plainly, the promise of a dollar payable in several years is not worth 100 cents today.")

tiff has not demonstrated that notice of the garnishment was served on Debtor nor did any testimony indicate that the she was informed of the garnishment by Savage. Indeed, it appears that Savage himself may not have been aware of the garnishment since the garnishment appears to have been served on his daughter Kathleen Savage ("K. Savage"), in her capacity as the manager of Savage's bar called Ron's Place. (Tr. 2/28/01 Savage at 50, K. Savage at 52–53); (Pl.Ex.4). No evidence was presented that Plaintiff pursued any action to enforce this writ against the garnishee, Savage, Inc., after service [8] that would have made Savage aware of the garnishment.[9]

Debtor disposed of some portion of the proceeds of the prepayment in the following manner: (1) to repay Daniel Camac, a friend, $2,000.00 that he loaned Debtor to prevent foreclosure on her residence [10]; (2) to pay "past due" mortgage payments on her residence to the mortgage holders who were threatening foreclosure; (3) to pay those mortgages ahead one month; (4) to pay her light, phone and cable bills "far" in advance; and (5) to make repairs to her residence. (Tr. 2/28/01 Bernier at 33–35, 45.) Plaintiff offered no proof on the amounts of these disbursements at trial, nor did he offer proof of the additional disbursements he has asserted occurred or the $13,000.00 in cash withdrawals which he claims in post-trial briefing were secreted by Debtor from the creditors of her estate.

Debtor filed her personal petition for relief under chapter 7 on September 24, 1999 [11]. The chapter 7 trustee has certified Debtor's case as a no asset case. (Case No. 99–3457–PJW, Doc. 16, 17, 18.) In her Statement of Financial Affairs, Item 1, Debtor listed income for 1997, 1998 and 1999. In all three years, the sole source of income listed is Lemlee, Inc. Income for 1997 and 1998 is listed as $24,000.00 in each year and $35,000.00 is listed as income in 1999. The amounts in 1997 and 1998 are equivalent to the sum of the twice annual payments of $12,000.00

---

8. Again, no finding is made by this Court as to what action Plaintiff actually took or did not take to enforce his garnishment as that will be a matter for the state courts and is not essential to the holding in this case. However, for the purposes of this case, no such evidence has been entered.

9. Generally, a garnishee must answer the summons in the garnishment within a specified time. The garnishment submitted by Plaintiff with his proof of claim (Claim 3) states: "The Superior Court requires you to inform James R. Leonard, Esquire, ... of all money, goods, credits and effect stocks, bonds, personal property, and/or real estate belonging to the defendant you currently possess.... **You must do this within 20 days after service of this writ upon you** ... Your failure to respond may result in a default judgment against you for the amounts the defendant owes ..." (emphasis in original)

In the normal course, the garnishee would appear, answer as to the property and credits of the defendant held in the garnishee's possession and then a judgment would be entered against the garnishee in an amount no greater than that which the defendant could have sued the garnishee for based on the debt contract. 2 *Woolley on Delaware Practice*, (Gaunt & Sons 1985) §§ 1165, 1189, 1191–94 (1906). If the garnishee fails to answer or appear in the twenty days, the plaintiff can compel the garnishee's appearance by attaching the garnishee's property. 10 *Del.C.* § 3509 (West 2002); 2 *Woolley, supra*, § 1196. Plaintiff entered no evidence that he attempted to compel the garnishee, here Savage, Inc., to inform the Plaintiff's attorney as to what property of the defendant, here Debtor, that the garnishee held.

10. This repayment occurred on May 20, 1999, which is before the preference period. (Tr. 2/28/01 Bernier 45–46.) Plaintiff did not challenge the existence or purpose of this loan at trial.

11. Case number 99–3457–PJW.

due under the Note. (Pl.Ex.1.) The 1999 amount is equivalent to the $35,000.00 prepayment amount of the Note. (Pl.Ex.3.)

## DISCUSSION

 Plaintiff seeks denial of Debtor's discharge under § 727(a)(2)(A). Completely denying a debtor his discharge is an extreme step and should not be taken lightly. *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir.1993). The discharge provision in § 727 is at the "heart of the fresh start provisions of the bankruptcy law." *Id. citing* H.R.Rep. No. 595, 95th Cong., 1st Sess. 384 (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6340. The section is to be liberally construed in favor of the debtor. *Id.* Section 727(a)(2)(A) reads in relevant part:

"(a) The court shall grant the debtor a discharge, unless—

... (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed....

(A) property of the debtor, within one year before the date of the filing of the petition; ......"

11 U.S.C. § 727(a)(2)(A) (West 2002).

 Therefore, in order to bar a debtor's discharge under § 727(a)(2)(A), the plaintiff must prove each the following four elements by a preponderance of the evidence: (1) the debtor transferred, removed or mutilated, (2) his or her property, (3) within one year of the bankruptcy petition's filing, (4) with the actual intent to hinder, delay, or defraud a creditor. *See Rhode Island Depositors Econ. Prot. Corp. v. Hayes (In re Hayes)*, 229 B.R. 253, 259 (1st Cir. BAP 1999); *Rosen*, 996 F.2d at 1530–31; *Bank of Chester County v. Cohen (In re Cohen)*, 142 B.R. 720, 725–26 & 728 (Bankr.E.D.Pa.1992); *Carter*

*Eng'g Co. Inc. v. Carter (In re Carter)*, 236 B.R. 173, 182 (Bankr.E.D.Pa.1999). The requisite actual intent to hinder, delay or defraud must exist at the time of the transfer. *Carter*, 236 B.R. at 182. The first and third elements of the test have clearly been met. There is no dispute that the prepayment of the Note occurred within one year prior to the filing of Debtor's chapter 7 petition. Similarly, there is no dispute that some unproven amount of the proceeds of that Note prepayment, however they came to be in Debtor's pre-petition estate, were transferred away from the estate in a series of transactions shortly thereafter. Therefore, the two elements which Plaintiff must demonstrate by a preponderance of the evidence in order to prevail under § 727(a)(2)(A) are: 1) that property of the debtor was the subject of the transfers and 2) that the debtor had the actual intent to hinder, delay or defraud creditors.

 Wrongful intent is a question of fact for the court. *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 307 (11th Cir.1994); *Emmett Valley Assocs. v. Woodfield (In re Woodfield)*, 978 F.2d 516, 518 (9th Cir.1992). Plaintiff must prove by a preponderance of the evidence either that Debtor acted with the intent to hinder or delay her creditors or with the intent to defraud her creditors. *See NCNB Texas Nat'l Bank v. Bowyer, (In re Bowyer)*, 916 F.2d 1056, 1059 (5th Cir. 1990) *rev'd on other grounds on pet. for reh'g by NCNB Texas Nat'l Bank v. Bowyer, (In re Bowyer)*, 932 F.2d 1100 (5th Cir.1991), *reh'g and reh'g en banc denied* (5th Cir.1991) ("the term 'defraud' does not subsume 'hinder or delay' "). Acting with an intent to hinder or delay a creditor is sufficient for denial of discharge under § 727(a)(2)(A). *See Bowyer*, 916 F.2d at 1059; *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562,

568 (7th Cir.1989); *First Leasing Co. v. McGalliard (In re McGalliard)*, 183 B.R. 726, 732 (Bankr.M.D.N.C.1995). However, it is also clear that § 727(a)(2)(A) "does not deny a discharge every time that the debtor's acts result in a delay or hindrance to a creditor. If this were otherwise, the mere act of filing in bankruptcy, because its effect is to delay and hinder creditors, would deny the debtor his discharge." *McGalliard*, 183 B.R. at 732 *citing Taunt v. Wojtala (In re Wojtala)*, 113 B.R. 332, 335 (Bankr.E.D.Mich.1990). Therefore, courts focus on the intent of the debtor at the time the transfer was made rather than the effect of the transfer. *McGalliard*, 183 B.R. at 732; *Wojtala*, 113 B.R. at 335. Recognizing the difficulty of proving actual intent to hinder, delay or defraud, courts have identified several "badges of fraud" or wrongful intent which, if present in the circumstances surrounding the transaction, may establish the requisite actual intent. *Cohen*, 142 B.R. at 728; *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d. Cir. 1983). The general facts surrounding a case are key instruments used to gauge intent because an individual's intent is seldom admitted to and is difficult to prove. *Cohen*, 142 B.R. at 728; *Carter*, 236 B.R. at 182 ("Actual intent may be inferred from the totality of the circumstances."); *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir.1989); *Bowyer*, 916 F.2d at 1058–59 (court examined the circumstances surrounding the transfers for extrinsic evidence of intent to hinder or delay). Certain badges of fraud suggest that a transaction's purpose is to hinder, delay or defraud creditors unless some other convincing explanation appears. *Woodfield*, 978 F.2d at 518.

■■■■ Some of the factors evidencing actual intent to defraud under section § 727(a)(2)(A) include: lack or inadequacy of consideration; the family, friendship or close associate relationship between the parties; the retention of possession, benefit or use of the property in question; the financial condition of the party sought to be charged both before and after the transaction in question; the existence or cumulative effect of the pattern or series of transactions or course of conduct after incurring of debt, onset of financial difficulties or pendency or threat of suits by creditors; and the general chronology of the events and transaction under inquiry. *See Carter*, 236 B.R. at 182; *see also Chastant*, 873 F.2d at 91; 6 *Collier on Bankruptcy*, § 727.02[3](b) (15th ed. rev.2000); *Kaiser*, 722 F.2d at 1582–83; *Woodfield*, 978 F.2d at 518 (transfer so completely depleted the debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment is indicative of intent). In addition to these badges of fraud, other factors indicative of an actual intent to hinder or delay a creditor are: whether the transaction is conducted at arm's length; whether the debtor is aware of the existence of a significant judgment or over-due debt; whether a creditor is in hot pursuit of its judgment or claim and whether the debtor knows this; and the timing of the transfer relative to the filing of the petition. *Wojtala*, 113 B.R. at 336–37. The debtor's intent to prefer one bona fide creditor over another is not equivalent to intent to hinder, delay or defraud creditors. *Miller*, 39 F.3d at 307; 6 *Collier on Bankruptcy*, § 727.02[3][c] (15th ed. rev.2000).

■■■■ In determining if wrongful intent existed at the time of the transfer, courts examine the totality of circumstances surrounding a transaction. Therefore, in addition to the evidence of actions taken by a debtor which are purported by a plaintiff to be indicia of intent to defraud, hinder or delay, the court may also consid-

er the implications of the absence of certain badges of fraud or badges of intent to hinder or delay in the circumstances surrounding the transfer and/or evidence of a legitimate purpose for the transfer. *See Rosen*, 996 F.2d at 1532 (the relevant intent is the intent accompanying the act, as the act may be unaccompanied by a wrongful intent); *Cohen*, 142 B.R. at 728 (court considered the absence of significant badges of fraud). Indeed, the absence of several very significant badges of wrongful intent may **disprove** actual intent to hinder, delay or defraud. *Cohen*, 142 B.R. at 729. (court considered the fact that the chronology did not establish the pendency or threat of suit by creditors or add to the likelihood of an improper motivation for the transfer.) The court may also consider the debtor's state of mind when determining if the requisite intent exists. The trier of fact must determine why the debtor took such action as "[a]n individual's intent does not exist in a vacuum; in the context of § 727(a) the relevant intent is the motivation accompanying certain physical action." *Rosen*, 996 F.2d at 1533. Evidence of some other convincing explanation other than an intent to hinder, delay or defraud may supercede the implications initially presented by the presence certain badges of fraud. *See Woodfield*, 978 F.2d at 518.

### The Transfer of the Note Does Not Support a Denial of Discharge:

▆▆▆ Plaintiff asserts that Debtor should be denied a discharge under § 727(a)(2)(A) because within one year of bankruptcy, Debtor transferred a valuable property right to receive $54,000.00 in payments from Savage under the Note for a discounted lump-sum payment of $35,000.00 pursuant to a buy-out agreement with the intent to hinder or delay Plaintiff from collecting his 1994 Judgment against Debtor. (*See* Doc. 16 at 3, 4, 6.) However, I find that Plaintiff has failed to prove that the Note was the property of the Debtor and therefore, the pre-payment of the Note cannot serve as a basis of a § 727(a)(2)(A) motion.

While the evidence clearly shows that the Note was property of Lemlee, not Debtor, Plaintiff has asserted that the property of Lemlee is in reality the property of Debtor under a theory of alter ego. Offering no citation to Delaware case law on the issue [12], Plaintiff alleges that Debtor treated Lemlee as her alter ego. (Tr. 2/28/01 at 4.) In support of this allegation, Plaintiff asserts that Debtor's depositing of one of the corporate checks into her personal account was evidence that Debtor used the corporate shell as her alter ego. (Doc. 18 at 1.) Although not specifically tied to an allegation of alter ego, Plaintiff also alleges in his opening brief that subsequent to signing the Note, Debtor allowed the corporation to lose its good standing, closed its bank accounts and received all payments under the Note individually. (Doc. 16 at 3.)

It is Plaintiff's duty to make his case. This Court is not required to conduct Plaintiff's legal research for him. Of Plaintiff's assertions made in support of his alter-ego theory, Plaintiff has only offered evidence suggesting that one $5,000.00 check may have been made to the Debtor directly rather than to Lemlee. This is not sufficient to support a finding that Debtor treated Lemlee as her alter ego. Nor has Plaintiff offered bank records, cancelled checks or testimony to indi-

---

12. In his reply brief, Plaintiff states merely that "As regards piercing the corporate veil, the evidence is replete that Mrs. Bernier used the corporate shell as her alter ego." (Doc. 18 at 1.)

cate that Debtor took all payments under the Note individually.

■ Plaintiff has also failed to demonstrate that there is any other basis for finding that Lemlee was non-existent. Generally, a corporation is an entity distinct from its shareholders even if its stock is wholly owned by one person. *Scott–Douglas Corp. v. Greyhound Corp.*, 304 A.2d 309, 314 (Del.Super.Ct.1973) Plaintiff has pointed to no law or court order that terminated Lemlee's existence or required its dissolution such that any property it held would be considered to have been distributed to its sole shareholder, Debtor. The sale of the two bars did not mandate Lemlee's dissolution under Delaware law nor has Plaintiff provided any evidence that Lemlee's charter was revoked. Even if there was a dissolution of any kind, the corporation continues to exist by statute for three years to wind up its affairs, distribute assets to shareholders, and answer suits. 8 *Del.C.* § 278 (West 2002).

The Court need not delve too deeply into the alter ego theory or lapse theory, since Plaintiff has also failed to demonstrate by a preponderance of the evidence that the buyout of the Note was made with the actual intent to hinder, delay or defraud creditors. The evidence admitted at trial provides a convincing explanation for the buy-out that overcomes any hint of suspicion raised by the discounted buy-out of the Note. Given Debtor's financial position, her health, her inability to work due to her disability, the threatened foreclosure on her home, the previous discharge of the Harris note in bankruptcy, Savage's difficulty in making the bi-annual payments and her lack of other income sources, a 10.8% discount on the principal amount of the Note is not an indicia of fraud. Plaintiff has not proven that he had any claim to the Note or its proceeds, so it is difficult to see how Debtor was attempting to hinder or delay the collection of Plaintiff's 1994 Judgment through the buy-out. Indeed, Plaintiff has not demonstrated to this Court that the garnishment was an effective attempt at collection against the Note.[13]

Additionally, Plaintiff has not proven that Debtor had any improper motivation to sell the Note at a discount. Plaintiff did not demonstrate that Debtor was aware of the 1994 Judgment or the garnishment. The timing of the Buy-out Agreement, more than four years after the 1994 Judgment, at least three months after the purported service of the garnishment and four months prior to Debtor's bankruptcy petition is not indicative of a debtor who is trying to hinder or delay her creditors' efforts at collection. *See Wojtala,* 113 B.R. at 337 (extrinsic evidence of intent to hinder or delay where transfer of property made four days after debtor was served

---

13. The garnishment named Ronald D. Savage, Inc. as garnishee by serving Ronald D. Savage. (Pl.Ex. 4 at 2.) This made the garnishment effective as to the garnishee, Ronald D. Savage, Inc., not the individual Ronald D. Savage. (Pl.Ex. 4 at 2.) It is not clear to this Court whether a payment by Savage, Inc. on the behalf of Savage individually would be a violation of the garnishment. The garnishee was instructed to pay "all money, goods, credit and effects, stocks, bonds, personal property, belonging to or payable to Margaretta Bernier" to the Plaintiff's attorney. (Pl. Ex.4.) However, the payments under the Note were payable to Lemlee, Inc. At trial, Plaintiff's counsel claimed that the Note was property of Debtor under a theory of alter ego. However, in order for this garnishment to be an effective collection effort, Plaintiff should have first obtained a determination regarding alter ego at the state court level when the garnishment was issued based on the 1994 Judgment against Margaretta Bernier. Plaintiff entered no evidence of any state court holding that Lemlee was the alter ego of Debtor such that a garnishment of Debtor's property was also a garnishment of Lemlee's property.

with writ of attachment and bankruptcy filed five days after transfer);*Pomerantz v. Pomerantz, (In re Pomerantz),* 215 B.R. 261, 262–64 (Bankr.S.D.Fla.1997) (extrinsic evidence of wrongful intent where twenty days after summary judgment was entered but before the monetary judgment was entered, debtor wired money to which plaintiff had a claim from New York where debtor resided to Florida and then used funds to purchase an exempt homestead).

Similarly, Plaintiff has offered no proof that the Note was placed in Lemlee to protect it from his 1994 Judgment. *See Kaiser,* 722 F.2d at 1583 (shifting of assets by debtor to a corporation wholly owned and controlled by him was extrinsic evidence of wrongful intent); *Woodfield,* 978 F.2d at 518–19 (debtor's creation of corporation and subsequent transfer of assets to corporation in anticipation of bankruptcy was extrinsic evidence of wrongful intent). Rather, Debtor sold an asset of Lemlee and brought the proceeds into her personal possession through a liquidating dividend. By taking the proceeds of the Note out of Lemlee, and depositing the proceeds in her checking account, Debtor made her primary asset, the value of her stake in Lemlee, more available to Debtor's personal creditors, not less available. That is simply not an action designed to hinder, delay or defraud Debtor's creditors. Had Plaintiff been vigilant, he could have taken action to attach Debtor's personal account or pursued an action against the purported garnishee, Savage, Inc.

Therefore, based on the foregoing, the Court holds that Plaintiff is not entitled to relief under § 727(a)(2)(A) based on the discounted buy-out of the Note.[14]

## Debtor's Use of the Proceeds Does Not Support Denial Of Discharge:

■ Debtor clearly brought the $35,000.00 under her personal control by some means and used those funds for her personal needs. Therefore, the Court will consider those funds to have been property of Debtor. However, Plaintiff has not proven that Debtor's use of those proceeds demonstrated an actual intent to hinder, delay or defraud Debtor's creditors as required by § 727(a)(2)(A). Plaintiff has asserted that Debtor's distribution of the proceeds were made (1) to her mortgage companies to enhance her position with regard to exempt property; (2) to herself in the form of cash so that she could abscond with or secret the cash from her creditors; and (3) to bring certain bills due and pay them in advance. (Doc. 16 at 3, 6.) The Plaintiff has not proven that cash distributions were made to Debtor. With regard to the mortgage payments and the payment of Debtor's bills, the Court finds that an actual intent to hinder, delay or defraud cannot be discerned from the totality of circumstances surrounding those transfers.

Based on the hearing record, the transfers at issue include: (1) a payment of $2,000.00 to Daniel Camac, a friend, which was made prior to the preference period to repay money that he loaned Debtor to prevent foreclosure on her residence; (2) payment of "past due" mortgage payments for Debtor's residence to prevent a threatened foreclosure; (3) one month advance payment of mortgages on Debtor's residence; (4) payment of light, phone and cable bills "far" in advance; and (5) repairs to Debtor's residence. Plaintiff offered no

---

**14.** The finding that the Note was not property of the Debtor moots many of Plaintiff's alleged badges of fraud. Debtor was not required to disclose the buyout, nor did she transfer property of the Debtor when the Note was paid off. Debtor also properly disclosed the payout of the proceeds as income from Lemlee, since the Note had been held by Lemlee. (*See* Doc. 16 at 6.)

proof on the amounts of these disbursements at trial, nor did he offer proof of additional disbursements or proof of the alleged $13,000.00 in cash withdrawals which he claims in post-trial briefing were secreted by Debtor from the creditors of her estate. The Court therefore lacks any reference as to Debtor's normal expenses or the size of the transfers to determine the significance of these payments. Plaintiff attached a check register to his opening brief (Doc 16, Appendix 4.) which he asserts details the disbursements made by Debtor. However, as this evidence was not presented at the trial where its veracity could be challenged or its meaning discerned, the Court cannot now consider it. (Tr. 2/28/01 The Court at 55–56); *In re Aughenbaugh*, 125 F.2d 887, 889 (3d Cir. 1942) (A party to litigation is entitled to have the evidence relied upon by his opponent presented at the hearing of his case so that he may have an opportunity for cross–examination and rebuttal.) Finally, in the Court's view, even if admitted, the check register standing alone simply does not demonstrate an attempt by Debtor to secret her assets or convert all her assets to exempt property as alleged by Plaintiff.

 The only purported indicia of fraud left to Plaintiff is Debtor's payment to mortgagees for her residence. Even if evidence had been admitted as to the amount of the mortgage payments, the back mortgage payments to stave off foreclosure on Debtor's residence and the one month pre-payment of those mortgages simply are not evidence of actual intent to hinder delay or defraud creditors. The traditional doctrine on the conversion of non-exempt assets to exempt assets is that such conversion, even on the eve of bankruptcy and even when the transfer leaves the debtor insolvent, is not in itself support for finding actual intent to hinder, delay or defraud. *See* 2 David G. Epstein et al., *Bankruptcy*, § 8–32 at 574–75 (West 1992); *accord Bowyer*, 916 F.2d at 1059. The debtor is entitled to make legitimate, full use of the exemptions to which she is entitled by law and is free to engage in a certain amount of bankruptcy exemption planning. 2 Epstein, *supra*, § 8–32 at 575. However, a debtor is not allowed to convert assets for fraudulent purposes. *Id.* A conversion is fraudulent if extrinsic evidence, beyond the conversion itself, establishes that the debtor acted with intent to hinder, delay or defraud her creditors. *Id.; See also Bowyer*, 916 F.2d at 1060 (" . . . while some pre-bankruptcy planning is appropriate, the whole sale expenditure of non-exempt assets on the eve of bankruptcy, including conversion to exempt assets (especially where there are liberal state law exemptions), may not be.").[15]

The two cases cited by Plaintiff in support of his contention that the conversion of non-exempt to exempt assets is an indica of fraud both concur with the doctrine just described. *See Lambrakis v. Segal (In re Segal)*, 227 B.R. 191, 195 (Bankr. S.D.Fla.1998) ("The mere conversion of nonexempt property to exempt property is not considered to be fraudulent as to creditors; there must be some extrinsic evidence of fraudulent intent."); *Pomerantz v. Pomerantz (In re Pomerantz)*, 215 B.R. 261, 264 (Bankr.S.D.Fla.1997) ("As a general matter the transfer of non-exempt into exempt assets is allowable. However the conversion may be considered fraudulent if the other extrinsic evidence of fraud

---

**15.** On petition for rehearing, the court added: "Of course, conversion of non-exempt assets into exempt assets may be relevant where other evidence proves actual intent to defraud creditors. [ . . . ] Critically the factfinder in today's case found no such fraudulent intent." *NCNB Texas Nat'l Bank v. Bowyer, (In re Bowyer)*, 932 F.2d 1100, 1102 (5th Cir.1991) *reh'g and reh'g en banc denied* (5th Cir.1991).

is evident."). In both of these cases the debtor converted a non-exempt asset into an exempt asset through the purchase of a new home. This fact standing alone was not sufficient for either court to deny discharge. *See Pomerantz,* 215 B.R. 261; *Segal,* 227 B.R. 191.[16] The courts in these cases found extrinsic evidence of intent to hinder, delay or defraud in the facts surrounding the conversions. This extrinsic evidence included the conversion of an asset which was tied to the claim of a specific creditor, the timing of the conversion in relation to a judgment, the fact that all of debtor's money went into the exempt asset, failure to adequately explain a sudden move in location, especially to a jurisdiction with 100% homestead exemption, a pattern of sharp dealing with the complaining creditor designed to prevent them from collecting their debt, and failing to disclose the transfer of an asset to which the creditor had a claim or upon which a creditor relied in extending credit. *See id.*

The case at hand is strikingly dissimilar. The only indicia of fraud alleged by Plaintiff related to the mortgage payments is that the payments converted a non-exempt asset into an exempt asset. This standing alone is not sufficient for this Court to deny Debtor her discharge. None of the circumstances that could provide extrinsic evidence of fraudulent intent identified by the *Pomerantz* or *Segal* courts are present in this case. Debtor already owned her home. Making mortgage payments was not out of the ordinary course for Debtor.

Nor was paying the mortgage ahead. *Pomerantz,* 215 B.R. at 263–64 (finding that even unwise or extravagant spending was not evidence of intent to hinder, delay or defraud creditors when such spending habits were not inconsistent with prior behavior); Tr. 2/28/02 Bernier at 33 (testifying that she would normally pay the mortgages ahead when Savage made the bi-annual payments of $12,000.00 since she would not receive more money for six months). The timing of the payments of the back mortgage due and one month ahead bear no relation to the entry of the 1994 Judgment, the service of the garnishment or Debtor's Chapter 7 petition and Plaintiff has failed to demonstrate that Debtor had knowledge of either the 1994 Judgment or the garnishment at the time of the mortgage payments. Plaintiff has not demonstrated that he had any legitimate claim to the proceeds of the Note. Finally, the mere intent to prefer one bona fide creditor, the mortgage holders on Debtor's residence, over another creditor is not an indicia of an intent to hinder or delay Plaintiff's collection effort especially when there is no evidence that Debtor was aware of the 1994 Judgment or Plaintiff's attempts at collection. *Miller,* 39 F.3d at 307.

The Court also finds that the threatened foreclosure on Debtor's home is a circumstance that provides a legitimate motive for Debtor's mortgage payments. Debtor was certainly not required to be-

---

**16.** Plaintiff has also offered *Segal* for the proposition that the transfer of a note at a discount and the conversion of the proceeds into an exempt asset is proof of fraudulent intent and asserts that the case is directly on point with the facts of the present case. (Doc. 16 at 7, Doc. 18 at 1) I disagree. First, in the case of *Segal,* the note in question was property of the debtors. That is not the case here. Second, in *Segal* the complaining creditor had relied on the debtors' assertions that the

note would be available to satisfy their payment of an obligation due to the creditor and as a result of such reliance, the creditor had released a security interest. Debtors then sold the note at a discount, never informed the creditor and then purchased an exempt homestead with the proceeds. In this case, Debtor never induced Plaintiff to rely on the Note and Debtor was unaware that Plaintiff was relying on the Note to satisfy his judgment.

come homeless so that Plaintiff who failed to pursue his judgment for more than four years and who failed to pursue his rights against the purported garnishee could have yet another chance and yet more time to attempt to collect his 1994 Judgment. Nor was Debtor required to go without electricity or reliable transportation or living necessities or to forgo paying any existing, bona fide creditor in order to give Plaintiff such an opportunity. Plaintiff's failure to collect on the 1994 Judgment seems to be based solely on Plaintiff's inactions, rather than Debtor's actions. Since Plaintiff has failed to carry his burden of proof, the Court concludes that Debtor did not act with actual intent to hinder, delay or defraud her creditors and Plaintiff's objection to discharge must be dismissed.

## CONCLUSION

For the forgoing reasons, the Court finds that Plaintiff has not met his burden of proof under 11 U.S.C. § 727(a)(2)(A). Therefore, Plaintiffs objection to Debtor's discharge is denied.